UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

GEORGE PAYNE JR,

    Plaintiff,

    v.

INDIANA DEPARTMENT OF
CORRECTIONS,

    Defendant.

Case No. 3:23-CV-909-CCB-SJF

## OPINION AND ORDER

Before the Court is Defendant Indiana Department of Corrections' ("IDOC")

Motion for Summary Judgment. (ECF 60). Plaintiff George Payne, Jr., opposes this

motion. (ECF 68). IDOC's motion is denied for the following reasons.

### I.    RELEVANT BACKGROUND

This is an employment discrimination case. Mr. Payne alleges in his operative

complaint that he was demoted by his employer, IDOC, as a result of race and sex

discrimination. (ECF 12 at 5). IDOC now moves for summary judgment, arguing that (1)

Mr. Payne cannot show that he was meeting IDOC's legitimate expectations, (2) he

cannot point to a more-favorably-treated comparator, (3) there is no evidence that Mr.

Payne's race or sex caused the demotion, and (4) IDOC's decision to demote Mr. Payne

was legitimate and nondiscriminatory. (ECF 61 at 1–2).

The undisputed facts are these:

Mr. Payne began his employment with IDOC as a correctional officer in 1991. (ECF 62-1 at 10:2–7). Between 1991 and 2015, Mr. Payne worked at Indiana State Prison, Maximum Control Complex, and Westville Correctional Facility, where he held the titles of Correctional Officer, Sergeant, Lieutenant, Captain, Lead Captain, and Major. (*Id.* at 10:2–18:18). In 2015, he was promoted to Deputy Warden at Westville Correctional Facility. (*Id.* at 18:14–23).

Typically, two Deputy Wardens are assigned to each IDOC facility. (*Id.* at 18:24–19:2). Their job description is the same, but they are assigned to different duties. (*Id.* at 19:3–15). The Deputy Warden of Operations focuses on custody staff, food service schedules, recreation schedules, and day-to-day operations. (ECF 62-6 at 9). In contrast, the Deputy Warden of Re-Entry focuses on programs, case planning, offender services, and rehabilitation. (*Id.*)

Mr. Payne initially served as the Deputy Warden of Operations at Westville. (ECF 62-1 at 32:11–14). In 2016, about a year later, he transitioned into the Deputy Warden of Re-Entry role. (*Id.* at 19:16–20). In 2017, he was transferred to Indiana State Prison as Deputy Warden of Operations, (*id.* at 26:4–13), and in 2019 he was transferred to Miami Correctional Facility ("MCF") as Deputy Warden of Operations, (*id.* at 30:1–7).

MCF was known as a violent prison, with a reputation for stabbings and assaults on staff. (ECF 67-1 at 25:20–26:12). It housed particularly difficult offenders. (ECF 67-2 at 103:17–21, 105:3–24). At the time of Mr. Payne's transfer, the Warden of MCF was William Hyatte. (ECF 62-1 at 33:3–15). Mr. Payne's counterpart, the Deputy Warden of Re-Entry, was initially Sharon Hawk. (*Id.* at 32:11–14). Ms. Hawk was replaced by

2

Jacqueline Scaife no later than March 2021, though the parties dispute exactly when that transition occurred. (*Id.* at 32:11–23). Ms. Scaife is a Black woman who began her career with IDOC in 2007. (ECF 62-6 at 9).

Beginning on May 8, 2022, Warden Hyatte took leave from MCF due to a personal family matter. (ECF 62-5 at 60:6–61:20). During part of the time that Warden Hyatte was on leave, Mr. Payne also took leave for personal reasons. (ECF 62-1 at 68:22–69:13). While Warden Hyatte and Mr. Payne were on leave, Ms. Scaife became Acting Warden of MCF. (*Id.*) During this time, she was the lone administrator at the facility. (ECF 62-3 ¶ 9). Warden Hyatte began to return to MCF "on and off" in June or July 2022. (ECF 62-5 60:6– 61:20).

In the summer of 2022, while Warden Hyatte was on leave, multiple inmate deaths occurred in quick succession at MCF. (ECF 62-2 at 11:5–9). Two inmates were stabbed to death, and another inmate death was linked to drugs. (*Id.* at 11:10–17). At the time of the deaths, Mr. Payne was the Deputy Warden of Re-Entry at MCF, and Ms. Scaife was the Deputy Warden of Operations. (*Id.* at 13:4–14:9). Shortly before the deaths, Mr. Payne and Ms. Scaife had switched roles, with Ms. Scaife transitioning from Deputy Warden of Re-Entry to Operations, and Mr. Payne transitioning from Deputy Warden of Operations to Re-Entry. (*Id.* at 13:4–12).

After the deaths, IDOC and the Indiana State Police both began investigating MCF. (*Id.* at 15:2–8). The IDOC investigative team interviewed MCF staff and took a culture survey. (*Id.* at 20:24–21:9). Additionally, the team looked into the general operations of MCF. (*Id.*) Following the departure of the investigative team, Richard

Curry and Richard Brown were assigned to MCF as temporary administrators. (*Id.* at 23:17–22). Mr. Curry is Black, and Mr. Brown is white. (ECF 62-1 at 162:7–15).

The IDOC investigative team prepared an assessment of MCF ("the Assessment") based on their interviews and analysis. (ECF 62-2 at 23:17–22).[1] After the investigations, IDOC administration and other staff met and discussed MCF's future administration. (ECF 62-3 ¶ 5). In August 2022, Mr. Payne was demoted from Deputy Warden of Re-Entry to Correctional Officer. (ECF 62-2 at 19:6–14). Ms. Scaife was placed on a Work Improvement Plan and transferred to Pendleton Correctional Facility, then subsequently transferred to the Correctional Industrial Facility. (ECF 62-2 at 27:6–19). Brian English was appointed Warden of MCF, (ECF 62-1 at 162:16–20), and Chris Ertel, a white man, was appointed Deputy Warden at MCF, (*id.* at 162:21–163:8).

During Mr. Payne's time as Deputy Warden at MCF, the parties agree that Warden Hyatte received oral complaints about Mr. Payne, (*see, e.g.*, ECF 72 ¶¶ 77, 81, 83), but never received any official complaints, (ECF 67-4 at 28:16–29:5). Warden Hyatte never initiated any disciplinary actions against Mr. Payne. (ECF 67-4 at 19:17–22). He dismissed complaints against Mr. Payne as "low-grade bellyaching" resulting from his and Mr. Payne's attempts to get MCF staff to change their habits. (ECF 67-4 at 29:6–30:24, 70:6–21). Warden Hyatte believed that staff complaints against Mr. Payne stemmed from Mr. Payne's efforts to hold the staff accountable. (*Id.* at 70:6–21).

---

[1] The parties dispute the admissibility of the Assessment for summary judgment purposes. The Court addresses that dispute below.

Warden Hyatte retired on August 21, 2022. (*Id.* at 5:3–6). After the deaths and subsequent media attention, and before Warden Hyatte's retirement, IDOC Acting Deputy Commissioner Richard Curry, Jr., visited MCF to speak with Warden Hyatte and attempt to figure out what was going wrong at the facility. (ECF 67-3 at 8:24–9:7, 18:7–13). Mr. Curry was told that the Warden and Deputy Wardens needed to be moved to another facility, (*id.* at 33:6–9), but he was not involved in the decision to demote Mr. Payne, (i*d.* at 34:7–16). Mr. Curry disagreed with the decision to demote Mr. Payne, characterizing it as "egregious" and "over-the-top." (*Id.* at 28:16–19, 29:15–19).

The former Commissioner of IDOC, Robert Carter, testified that he could not recall another case in which a Deputy Warden was demoted down to Correctional Officer. (ECF 62-4 at 33:10–17). He also testified that he had no reason to believe Mr. Payne's performance was deficient. (ECF 62-4 at 35:8–11). Along with his demotion, Mr. Payne was transferred to a new facility and placed in construction services, IDOC's maintenance and general construction division. (ECF 67-3 at 19:16–20). This new position in construction services does not offer any opportunities for promotion. (*Id.* at 20:11–13). Ms. Scaife was also transferred to a new facility, selected based on its proximity to her home. (*Id.* at 33:9–11). She maintained her position as Deputy Warden. (ECF 67-4 at 23:15–20).

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). But the Court will not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor will the Court conduct research or develop arguments for the parties. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

To survive summary judgment, the nonmovant "cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

### III.   ANALYSIS

Mr. Payne alleges that IDOC illegally discriminated against him based on his race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). IDOC moves for summary judgment on both aspects of Mr. Payne's Title VII claim. In support, it argues that (1) Mr. Payne cannot make out a prima facie case of race or sex discrimination, (2) Mr. Payne cannot show that his race or sex caused IDOC to take adverse employment action against him, and (3) IDOC had a legitimate, non-discriminatory reason for taking that action.

One way to establish employment discrimination under Title VII is by satisfying the *McDonnell Douglas* "three-step burden-shifting framework." *Ames v. Ohio Dep't of Youth Svcs.*, 605 U.S. 303, 308 (2025). At the first step, the plaintiff must establish a prima facie case of discrimination by producing sufficient evidence to support an inference of discriminatory motive. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If they are able to make out the prima facie case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action." *Id.* If the employer is able to do so, then the burden shifts back to the plaintiff to show that the "stated justification was in fact pretext for discrimination." *Id.* (internal quotation marks omitted). The *McDonnell Douglas* framework offers two paths for a plaintiff to prove his case: the direct route, where the plaintiff persuades the Court that a discriminatory reason "more likely" motivated the employer, or the indirect route, where the plaintiff shows that the employer's "proffered explanation is

unworthy of credence." *Id.* (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

But this burden-shifting method is not the only way to prevail. The "ultimate question" at the core of the *McDonnell Douglas* framework is whether "the defendant intentionally discriminated against the plaintiff." *Id. McDonnell Douglas*, like all "tests and rubrics for viewing discrimination claims," is merely one approach to answering this ultimate question. *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 994 (7th Cir. 2024) (quoting *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). As a general matter, a plaintiff may survive summary judgment if he shows that the totality of the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

### a. Prima Facie Case

First, IDOC argues that it is entitled to summary judgment because Mr. Payne cannot establish a prima facie case of discrimination in violation of Title VII. A prima facie case under *McDonnell Douglas* requires a plaintiff to show "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igsaki v. Ill. Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). IDOC contends that Mr. Payne can neither show that he met IDOC's legitimate expectations nor show that a similarly situated employee outside of his protected class received better treatment from IDOC.

### i. Legitimate Expectations

To show that Mr. Payne failed to meet legitimate employer expectations, IDOC points to the Assessment prepared by the IDOC investigative team. Mr. Payne contests the admissibility of the Assessment, and argues that the testimony of Mr. Hyatte, Mr. Curry, and Mr. Carter creates a genuine issue of material fact over whether Mr. Payne was meeting IDOC's legitimate expectations. He also argues that IDOC cannot conclusively establish the reason behind Mr. Payne's demotion. The Court agrees with Mr. Payne.

The only evidence that IDOC puts forward to show that Mr. Payne failed to meet its legitimate expectations is the Assessment. The Assessment was drafted by IDOC legal counsel Anna Quick. (ECF 64-1 ¶ 5). Among other things, it includes summaries of staff interviews in which employees express dissatisfaction with Mr. Payne. (*See* ECF 63 at 8, 17–22). Mr. Payne contends that the Assessment is inadmissible hearsay.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). With some exceptions, it is inadmissible. Fed. R. Evid. 802. Only evidence admissible at trial may be considered at summary judgment. *Smith v. City of Chi.*, 242 F.3d 737, 741 (7th Cir. 2001). Thus, for the Assessment to be considered here, IDOC must show either that it is not hearsay or that it falls into a hearsay exception.

IDOC first argues that the Assessment is not hearsay. It contends that the Assessment is not offered to prove the truth of the statements in it but to show what information IDOC decisionmakers had when they decided to demote Mr. Payne. Mr.

9

Payne responds that the Assessment is being offered not to show the information available to IDOC decisionmakers but to show that Mr. Payne was in fact not meeting legitimate expectations.

To prevail on this element of the prima facie case, IDOC must demonstrate that no reasonable jury could find that Mr. Payne met IDOC's legitimate expectations. If, as IDOC argues, the Assessment is merely evidence of what information IDOC decisionmakers had when they decided to demote Mr. Payne, the Assessment would only offer insight into whether those decisionmakers believed Mr. Payne was meeting expectations when they decided to demote him. This is not the inquiry. The prima facie case requires a plaintiff to show that he was meeting legitimate employer expectations. It does not require him to show that decisionmakers were aware he was meeting expectations and imposed an adverse employment action anyway. Such a requirement would be at cross-purposes with the indirect, burden-shifting framework of *McDonnell Douglas*, which "evolved" precisely "[b]ecause 'smoking gun' evidence of discriminatory intent is hard to come by." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016).

If, on the other hand, the Assessment is offered as evidence that Mr. Payne was actually failing to meet IDOC's legitimate expectations, it becomes difficult to argue that the Assessment is not being offered for the truth of the matters asserted within. To pick an example, one summary of an interview with an unidentified correctional employee relays the employee's opinion that Mr. Payne "would get upset and have staff reassigned to a different shift" as a result of a "grudge." (ECF 63 at 20). This is only

10

evidence that Mr. Payne failed to meet IDOC's expectations to the degree that the employee's statement is true. The same goes for the rest of the complaints. The Assessment only holds evidentiary value on this issue if it is true that Mr. Payne did "not listen or communicate well with most staff, (*id.* at 19), was prone to "outbursts," (*id.*), and was "running people off from working at the facility," (*id.* at 21). Because all of these statements were made out of court, and they are relied on here for their truth, they are hearsay.

IDOC next argues that these statements are admissible under the business records exception to the rule prohibiting hearsay. Under Federal Rule of Evidence 803, records of a regularly conducted activity, though hearsay, may still be admitted if they meet certain criteria. Fed. R. Evid. 803(6). It is not clear that the Assessment meets these criteria. To qualify for this exception, documents must have been made in the regular course of business. *Id.* It is "well established" that documents "prepared in anticipation of litigation" are not admissible under this exception. *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013). As the assessment was drafted by IDOC's legal counsel in the wake of several deaths at the facility and with the "secondary purpose" of offering "recommendations for the future employment of the current administration of MCF," (ECF 63 at 2), it strikes the Court as unlikely that it was produced in the regular course of business. In addition, for this exception to apply, documents must be accompanied by "testimony of the custodian or another qualified witness, or by a certification that complies with [Federal Rule of Evidence] 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D). Here, the only evidence identified by the parties

11

that approaches that requirement is Mr. Curry's affidavit, in which he states that the assessment was prepared and that it included complaints from staff members about members of MCF's administration. (ECF 62-3 ¶ 12). Again, this does not seem to satisfy the requirements of Rule 803(6).

But the Court need not reach a final determination on this issue today, because even if the Assessment is admissible, Mr. Payne has introduced sufficient contradictory evidence to create a genuine issue of fact over whether he was meeting IDOC's legitimate expectations. First, he points to the testimony of Mr. Hyatte. It is undisputed that Mr. Hyatte, the MCF Warden and Mr. Payne's direct superior, believed complaints against Mr. Payne were "low grade bellyaching" arising from his and Mr. Payne's attempts to hold staff accountable. (ECF 67-4 at 29:6–30:24, 70:6–21). Mr. Payne argues in his brief that staff were displeased with Mr. Payne because he was doing what he was brought in to do: "get the staff to change their old habits in order to address the issues caused by an increase in high level offenders at MCF." (ECF 68 at 6). In support, he emphasizes Mr. Hyatte's testimony that before Mr. Payne arrived, inmates "had free run of the place," and staff were struggling to adjust to MCF's transition from "a medium/minimum security minded facility" to one with "high security level offenders." (ECF 67-4 at 30:4–24). Mr. Hyatte described himself and Mr. Payne as "trying to get [staff] out of their old habits," (*id.*), praised Mr. Payne's work as "exceptional," and testified that Mr. Payne "did exactly what he was told, when he was told," (*id.* at 19:23–20:8).

12

In response, IDOC points to the undisputed fact that Mr. Hyatte did receive oral complaints about Mr. Payne. It emphasizes that "a jury *could* find credibility issues with Hyatte's testimony" because Mr. Hyatte retired as a result of the MCF incidents. (ECF 71 at 5 (emphasis added)). Finally, it points out that Mr. Hyatte was not a member of the investigative team or a decisionmaker for IDOC in the wake of the deaths at MCF. For these reasons, IDOC argues that Mr. Hyatte's testimony cannot create a dispute of material fact over whether Mr. Payne met IDOC's legitimate expectations.

IDOC's arguments miss the mark. First, IDOC inverts the summary judgment standard. IDOC's burden is not to show that a jury "could" decline to credit Mr. Hyatte's testimony. Instead, it must show that no reasonable jury could credit Mr. Hyatte's testimony. *See Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). Because IDOC has not met that high bar, the Court will not disregard Mr. Hyatte's testimony. And the fact that Mr. Hyatte received oral complaints about Mr. Payne is not remotely dispositive of whether Mr. Payne met IDOC's legitimate expectations. Bearing in mind its duty to draw reasonable inferences in Mr. Payne's favor, the Court need not strain to reach an explanation for why Mr. Payne's supervisor and the staff Mr. Payne was tasked with bringing in line might have different opinions of his job performance. Lastly, the fact that Mr. Hyatte was not a decisionmaker involved in Mr. Payne's demotion is not particularly relevant to whether Mr. Payne was meeting IDOC's legitimate expectations when he served directly under Mr. Hyatte. Though Mr. Hyatte may not have had the benefit of all the information considered by

13

those decisionmakers, as Mr. Payne's immediate superior he was certainly well-positioned to develop informed opinions about Mr. Payne's job performance.

Next, Mr. Payne points the Court to the testimony of Mr. Curry, IDOC's Acting Deputy Commissioner, and Mr. Carter, IDOC's former Commissioner. It is undisputed that Mr. Curry disagreed with Mr. Payne's demotion, characterizing it as "egregious" and "over the top." Though Mr. Carter could not recall Mr. Payne's demotion in detail, he remembered Mr. Payne and testified that he had no reason to believe Mr. Payne's performance was deficient. (ECF 67-1 at 34:1–17).

This evidence is not as strong as Mr. Hyatte's testimony. Mr. Carter was unable to testify to the details of Mr. Payne's demotion, (*see id.* at 32–35), and Mr. Curry, though clearly against Mr. Payne's demotion, has little to say about Mr. Payne's job performance before the demotion. IDOC argues that this testimony is unpersuasive because it does nothing to establish disparity of treatment based on race or sex. This argument is misplaced. Though the question of discrimination is the ultimate end of the burden shifting inquiry, Mr. Payne may establish that he met IDOC's legitimate expectations without showing any disparate treatment. Again, this is precisely the point of the burden shifting approach. Though there may be the rare "fabled employer who admits to firing an employee because of race [or sex,] . . .[f]ew discrimination cases are so straightforward." *Ortiz*, 834 F.3d at 765. Even so, this testimony does not create a genuine issue of material fact over this issue.

Though the testimony of Mr. Curry and Mr. Carter does not create a genuine issue over whether Mr. Payne met IDOC's legitimate expectations, the addition of Mr.

Hyatte's testimony is enough to create such a dispute of material fact. Drawing all reasonable inferences in Mr. Payne's favor, Mr. Hyatte's approval of Mr. Payne's work could convince a reasonable jury that Mr. Payne was meeting IDOC's legitimate expectations. Thus, this issue is inappropriate for resolution at summary judgment.

### ii.         *Similarly Situated Comparator*

Next, IDOC argues that Jacqueline Scaife, the MCF Deputy Warden who retained her rank when Mr. Payne was demoted, is not an adequate comparator for Title VII purposes.

The essence of the comparator inquiry can be reduced to a single question: "are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)). Though the similarly-situated inquiry does not require "mechanical, one-to-one mapping between employees," *id.* at 847, courts generally require comparator employees to have "dealt with the same supervisor, [be] subject to the same workplace rules, and [have] engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). "Whether a comparator is similarly situated is usually a question for the fact-finder." *Coleman*, 667 F.3d at 846.

IDOC accepts that Mr. Payne and Ms. Scaife were similarly situated due to their titles at the relevant time, that they both reported to Warden Hyatte, and that they both engaged in similar conduct because they both held the position of Deputy Warden. But

15

these, IDOC maintains, are the "lone comparable traits between Scaife and [Mr. Payne]." (ECF 71 at 7).

As Mr. Payne notes in response, those are a lot of comparable traits. To differentiate the two Deputy Wardens, IDOC leans heavily on Ms. Scaife's comparative lack of experience. It points out that Mr. Payne had 16 more years of experience at IDOC than Ms. Scaife, including 6 more years of experience as a Deputy Warden. But Ms. Scaife held the same job as Mr. Payne and was subject to the same standards. In fact, Ms. Scaife was the Deputy Warden of Operations leading up to the deaths at the facility, a role which both parties agree involves overseeing custody staff, food service schedules, recreation schedules, and day-to-day operations. Considering the obvious similarities between her role and Mr. Payne's, her comparative lack of experience in that role is not enough to eliminate any genuine issue of material fact over whether she is an adequate comparator. Thus, the Court may not resolve this issue at summary judgment.

### b. Legitimate Non-Discriminatory Rationale

IDOC argues that even if Mr. Payne can make out a prima facie case for discrimination, he cannot overcome IDOC's legitimate, non-discriminatory reason for his demotion. In support, it cites the Assessment as support for IDOC's conclusion that Mr. Payne failed to effectively manage his subordinates while Deputy Warden at MCF. In response, Mr. Payne argues that the support of his supervisors, the suspicious circumstances of his demotion, and IDOC's institutional protectiveness of Black women employees show that this rationale is pretext for discrimination.

To show that an employer's reason is pretextual, a plaintiff "must present evidence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011). It is not enough to show that "the employer's stated reason was inaccurate or unfair." *Id.* The question is "whether the employer honestly believed the reasons it has offered to explain the discharge." *Id.* Put another way, the plaintiff must show that "the employer's proffered reason . . . was a lie." *Naik v. Boehringer Ingelheim Pharm., Inc.,* 627 F.3d 596, 601 (7th Cir. 2010) (quoting *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005). To meet this burden, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the proffered reason "that a reasonable person could find [it] unworthy of credence." *Coleman,* 667 F.3d at 852 (quoting *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir. 2007)). Even if the employer's proffered reasons are "foolish, trivial, or base," honest belief in those reasons defeats the plaintiff's argument. *Boumehdi,* 489 F.3d at 792. But if the proffered reason was not "what induced [the employer] to take the challenged employment action, it was pretext." *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 418 (7th Cir. 2006).

To show pretext, Mr. Payne first points to Mr. Hyatte's testimony. Mr. Hyatte testified that his "35 years" in the IDOC system had taught him that IDOC was worried about its "look" when it came to "diversity and inclusion." (ECF 67-4 at 37:11–21). He believed IDOC "didn't want to mess with Jackie Scaife, because . . . she's a black female," so it made Mr. Payne a "scapegoat." (*Id.* at 37:25–38:3). Mr. Payne then reiterates that Mr. Carter did not believe Mr. Payne's performance was deficient and

17

Mr. Curry and Mr. Hyatte disagreed with Mr. Payne's demotion. Finally, he argues that the circumstances around his demotion were suspicious. To support this, he points to IDOC's interrogatory response, which represents that Mr. Carter demoted Mr. Payne, (ECF 67-5 at 3). As Mr. Payne notes, Mr. Carter testified that he was not involved in Mr. Payne's demotion and that it would have been handled by a deputy commissioner. (ECF 67-1 at 29:14–30:8).

In response, IDOC argues that the identity of the party who demoted Mr. Payne is not material, Mr. Hyatte's testimony is vague and conclusive, and the support of Mr. Payne's supervisors does not show that he was discriminated against. For purposes of summary judgment, none of these arguments avail.

In its brief, IDOC definitively states that Mr. Payne was demoted because "he did not know how to communicate with staff, he was problematic as a managing figure at MCF, . . . [he] ran 'help off' from MCF, . . . [he] threatened staff members, and [he] created an atmosphere of fear amongst his subordinates while Deputy Warden at MCF." (ECF 61 at 11). This is generally supported by IDOC's interrogatory response on the subject. (ECF 62-6 at 3). But the evidentiary value of the interrogatory response is diminished because it identifies Mr. Carter as the party who demoted Mr. Payne. In his deposition testimony, Mr. Carter flatly contradicts this, denying that he played a role in Mr. Payne's demotion. IDOC argues in its reply that any dispute over who actually demoted Mr. Payne is "immaterial" because IDOC itself is the only defendant here. (ECF 71 at 11). This is wrong. While IDOC may be the defendant, the inquiry here is whether Mr. Payne was demoted for discriminatory reasons. The identity of the person

or people who decided to demote him is material to that question because Mr. Payne's case turns on whether that person or those people's intent was discriminatory.

Similarly, Mr. Hyatte's testimony cannot be discounted out of hand. While the Court need not accept "conclusory allegations" that are unfounded in personal knowledge at summary judgment, *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990), Mr. Hyatte grounds his opinions in his 35 years of experience within IDOC. Because of that experience, a reasonable jury may well believe his testimony that IDOC used Mr. Payne as a "scapegoat" to avoid "mess[ing] with Jackie Scaife," a Black woman. (ECF 67-4 at 37:22–38:4). Mr. Hyatte's testimony is not dispositive of the matter, but just as he is well-positioned to know whether Mr. Payne met IDOC's legitimate expectations, he is also well-positioned to testify to how IDOC made employment decisions about Deputy Wardens in his facility.

But it is less clear that Mr. Carter, Mr. Curry, and Mr. Hyatte's disagreement with Mr. Payne's demotion is relevant to the question of pretext. Aside from Mr. Hyatte's belief that Mr. Payne was demoted due to race, the three IDOC employees do not cast doubt on IDOC's proffered reason for Mr. Payne's demotion. While they express skepticism that the demotion was fair or prudent, their testimony does not directly implicate IDOC's honest belief in its rationale.

Mr. Carter's disavowal of responsibility for Mr. Payne's termination does. When asked in discovery to identify the reason for Mr. Payne's demotion and the person responsible for his demotion, IDOC identified Mr. Carter and listed reasons that presumably led Mr. Carter to demote Mr. Payne. But Mr. Carter denied involvement.

19

This casts doubt on IDOC's rationale for demoting Mr. Payne. A reasonable jury could infer that if IDOC misidentified who decided to demote Mr. Payne, it also misrepresented the reasons that went into that decision. If the finder of fact doubts IDOC's proffered reason, Mr. Hyatte's testimony offers an alternative explanation: IDOC needed to blame someone for the problems at MCF. Ms. Scaife was the Deputy Warden of Operations at the time of the deaths, but IDOC did not want to demote a Black woman. So Mr. Payne, a white man already unpopular among the staff due to his strictness, was scapegoated because of his racial identity and gender. Though a jury may well decline to draw this inference against IDOC or credit Mr. Hyatte's alternative explanation, there are sufficient factual disputes present that IDOC may not prevail on this issue as a matter of law.

It is "axiomatic" that this Court "may not weigh conflicting evidence or make credibility determinations" at summary judgment. *Whitaker v. Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025). Instead, the Court has "one task, and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Because IDOC has not established that there is no genuine issue of material fact over whether its reasons for demoting Mr. Payne were pretextual, the Court may not issue summary judgment.

20

## IV.    CONCLUSION

For these reasons, IDOC's motion for summary judgment, (ECF 60), is **DENIED.**

SO ORDERED on May 4, 2026.

/s/ *Cristal C. Brisco*

CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT

21